UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 3:99-cv-00547-MMD-WGC |
| Plaintiff, | ORDER |
| v. | |
| JOHN C. CARPENTER and COUNTY OF ELKO, | |
| Defendants, | |
| THE WILDERNESS SOCIETY and GREAT OLD BROADS FOR WILDERNESS, | |
| Intervenors and Cross-Claimants. | |

I.      **INTRODUCTION**

In 1995, a storm damaged a stretch of a remote road ("South Canyon Road" or "the Road") in the Humboldt-Toiyabe National Forest in Elko County, Nevada. The Road's resulting inaccessibility — and conflicting plans for its repair — sparked a lengthy legal dispute between the county government, the federal government, and environmental groups. In this latest phase of the litigation, the Court must determine whether to approve a consent decree that memorializes a settlement agreement between Plaintiff United States and Defendant Elko County. Intervenors and Cross-Claimants The Wilderness Society and Great Old Broads for Wilderness (together, "TWS") object to the settlement, which recognizes Elko County's right-of-way to the

disputed 2.4-mile portion of the road. (*See* ECF No. 118 at 7 ("The United States will not now or in the future contest that Elko County has an R.S. 2477 right of way for a road running generally from Pavlak Grade to the Snowslide Gulch Trail head."); ECF No. 501 at 9.) In an earlier Order (ECF No. 507), the Court ruled that before the proposed consent decree can be approved, Elko County must show by clear and convincing evidence that such a right-of-way existed before the land was reserved from public use. The parties participated in a two-week evidentiary hearing on this issue in May 2015. This Order presents findings of fact and conclusions of law based on that hearing and the parties' related briefing.

## II.   PROCEDURAL BACKGROUND

This case has a long and complicated procedural history, including two trips to the Ninth Circuit Court of Appeals.[1] The United States initiated the lawsuit in October 1999, seeking declaratory and injunctive relief against several individuals who, following the 1995 storm, had threatened to rebuild the South Canyon Road. (ECF No. 1.) Elko County was added as a defendant several weeks later; in response, the County asserted a counterclaim seeking to quiet title to the South Canyon Road under a now-repealed federal statute known as Revised Statute 2477 ("R.S. 2477").[2] (ECF No. 9.) The parties proceeded to mediation. (ECF Nos. 5, 10.) After lengthy attempts to settle the case,[3] the Court approved a settlement agreement between the United States and Elko County on

---

[1]A third appeal occurred in a related case, *Great Old Broads for Wilderness v. Kimbell,* No. 3:07-cv-00170-RLH-RAM, in which TWS had challenged the Forest Service's decision on which methods to use in restoring the South Canyon Road. *See Great Old Broads for Wilderness v. Kimbell,* 709 F.3d 836 (9th Cir. 2013). TWS appealed the district court's decision to grant summary judgment in favor of the Forest Service. *Id.* at 841. The Ninth Circuit affirmed the district court's decision on the merits, finding that the Forest Service's decision regarding the Road was reasonable in light of the National Forest Management Act, an executive order governing floodplain management, and the National Environmental Policy Act. *Id.* at 849-55.

[2]Once codified as 43 U.S.C. § 932 (repealed 1976), R.S. 2477 provided that "[t]he right of way for the construction of highways over public lands, not reserved for public uses, is granted."

[3]TWS points out that an initial settlement agreement reached as early as 2000 did not recognize any right-of-way for Elko County. (ECF No. 501 at 12 (citing ECF No. 419 at 17-20).) Elko County objected to that agreement in November 2000. (*Id.*; *see* ECF No. 419 at 17-20 (voting to reject the settlement agreement and seek R.S. 2477 right-of-way through mediation during an Elko County Commissioners meeting).)

1  April 24, 2001. (ECF No. 118.) The parties agreed not to dispute the existence of an R.S.

2  2477 right-of-way for Elko County. (*Id.* at 7.)

3  TWS moved to intervene on March 30, 2001, shortly before the Court approved

4  the settlement agreement. (ECF No. 104.) The Court entered an order denying the

5  motion to intervene, which the Ninth Circuit later reversed. (ECF No. 123); *see United*

6  *States v. Carpenter* (*Carpenter I*), 298 F.3d 1122, 1125 (9th Cir. 2002) (finding that

7  TWS's motion to intervene following the announcement of the proposed settlement was

8  timely). Significant motions practice followed the appellate ruling, and the Court stayed

9  the implementation of the settlement agreement in the interim. In April 2006, the Court

10  held an evidentiary hearing on Elko County's quiet title claim; TWS, however, was not

11  permitted to participate fully in the quiet title litigation. (*See* ECF No. 165 (finding that

12  TWS lacked standing to defend against Elko County's quiet title claim).)

13  On September 19, 2006, several months after the hearing, the Court issued an

14  order approving the settlement agreement with respect to Elko County's right-of-way to

15  the South Canyon Road. (ECF No. 296.) TWS appealed the order and the Court's denial

16  of their request to participate fully in the evidentiary hearing. In 2008, the Ninth Circuit

17  vacated the Court's approval of the settlement of the quiet title claim, finding that TWS

18  should have been allowed to participate as a party to the settlement proceedings,

19  including the evidentiary hearing. *United States v. Carpenter* (*Carpenter II*), 526 F.3d

20  1237, 1238-40, 1242 (9th Cir. 2008). Extensive litigation — as well as further attempts at

21  settlement — ensued for the next several years.

22  In July 2013, with the parties' input, the Court identified three threshold legal

23  issues to assist in streamlining the resolution of the disputed settlement agreement.

24  (ECF No. 474 at 13-14.) The issues were: (1) whether the statute of limitations governing

25  Elko County's quiet title claim has expired and, if so, its effect on the claim; (2) what

26  standard of review applies to determining whether to approve a settlement in which the

27  federal government relinquishes its property rights; and (3) what standard of proof

28  governs Elko County's assertion that it has a right-of-way for the disputed road. (ECF

No. 507 at 1-2.) In August 2014, after reviewing the parties' briefs regarding these threshold issues, the Court held that the consent decree could not be approved unless Elko County demonstrated a right-of-way to the South Canyon Road by clear and convincing evidence. (*Id.* at 6-8.) The Court then granted Elko County's request for an evidentiary hearing on the existence of a right-of-way under R.S. 2477. (ECF No. 510.)

The Court convened an eight-day evidentiary hearing between April 27, 2015, and May 7, 2015. (ECF Nos. 557 to 560, 562 to 565.) Elko County and TWS also submitted simultaneously filed post-hearing briefs in October 2015. (ECF Nos. 591, 592.) In November 2015, TWS sought leave to respond to Elko County's brief, which the Court granted.[4] (ECF No. 594.) The following findings of fact and conclusions of law arise from the evidentiary hearing and the post-hearing briefs. After considering the evidence and legal arguments presented, the Court finds that Elko County has not demonstrated an R.S. 2477 right-of-way by clear and convincing evidence. The Court accordingly cannot approve the proposed consent decree.

## III.   FINDINGS OF FACT

### A.   The South Canyon Road

1.     The South Canyon Road snakes for 2.4 miles through the southern end of the Jarbidge Canyon (the "Jarbidge South Canyon" or "South Canyon"), a remote area located in the northern part of Elko County, Nevada. (ECF No. 519 at 3; EC Ex. 1193; US Ex. 710[5] at AR-015414.)[6]

---

[4]The Court also gave Elko County leave to file a reply to TWS's response. (ECF No. 594.)

[5]United States Exhibit 710 is a 2006 report on trail and road systems in the Jarbidge South Canyon authored by Richa Wilson and Fred Frampton. The parties have stipulated that the report "refers to historic governmental records and other documents that actually exist." (EC Ex. 1198.)

[6]The Court will refer to Elko County's evidentiary hearing exhibits as "EC Ex." Similarly, TWS's exhibits will be cited as "TWS Ex.," and exhibits presented by the United States during the 2006 evidentiary hearing will be referred to as "US Ex." Many of the United States' and TWS's exhibits are stamped with an administrative record ("AR") page number. For ease of reference, rather than citing the internal page number, the Court will use the AR page numbers when citing to a United States or TWS document. The United States filed a notice of manual filing of the AR (ECF No. 373) in June 2011; it includes an index to the AR by page number. (ECF No. 373-1.) A list of the United States' 2006 exhibits appears as ECF No. 568. Elko County's 2006 exhibits are listed at
*(...fn. cont.)*

2.      The Jarbidge River flows in a northern direction through the Jarbidge Canyon. (US Ex. 710 at AR-015414; Tr. 778.) Although generally referred to as the Jarbidge River, the river that runs through the Jarbidge Canyon is technically the west fork of the Jarbidge River.[7] (US Ex. 710 at AR-015414; EC Ex. 1019.) Another river dubbed the East Fork of the Jarbidge River runs several miles to the east. (EC Ex. 1019.)

3.      The Jarbidge South Canyon is part of an area once called the Bruneau Addition to the Independence Forest Reserve. (ECF No. 519 at 3.) The Bruneau Addition encompassed approximately 1,000 square miles. (Tr. 325, 1252, 1340.) Although the Secretary of the Interior temporarily withdrew the Bruneau Addition for consideration as a forest reserve on November 23, 1905, it was permanently reserved as a national forest through a presidential proclamation on January 20, 1909. (ECF No. 519 at 3.) Currently, the Jarbidge South Canyon is part of the Humboldt-Toiyabe National Forest. (*Id.*)

4.      The disputed South Canyon Road runs for approximately 2.4 miles along the Jarbidge River in the Jarbidge South Canyon. (ECF No. 118 at 20-21; *see infra* Figure 1.) The Road stretches along the bottom of the Jarbidge South Canyon from a northern starting point at approximately Pavlak Grade to a southern terminus at the Slowslide Gulch trailhead. (ECF No. 118 at 7, 20-21.) The northern starting point is more precisely described in the 2001 settlement agreement as "the southerly boundary of the right of way for the existing road commonly known as County Road 748, located in the SW 1/4 of Sec. 28, T. 46 N., R. 58 E. MDM." (*Id.* at 20.) The proposed settlement agreement grants Elko County a right-of-way over this entire 2.4-mile stretch at a width "sufficient to accommodate the running surface of the existing road and turnouts, plus ///

_____

(…fn. cont.)
ECF No. 567, and the County's exhibit list from the 2015 evidentiary hearing appears at ECF No. 566.

    [7]For clarity, the Court will refer to this river as the "Jarbidge River."

1    cut and fill slopes and back slopes necessary to maintain the running surface and

2    turnouts." (*Id.*)



Figure 1: Excerpt of ECF No. 118 at 21, showing the road in dispute. The northern

beginning point is the intersection of South Canyon Road and County Road 748. The

southern endpoint is the intersection of the Jarbidge River and the Snowslide Gulch

Trailhead.

5.       The town of Jarbidge sits to the north of the Jarbidge South Canyon, near

the intersection of Bear Creek and the Jarbidge River. (EC Ex. 1072; Tr. 1446-47; *see*

///

6

*infra* Figure 2.) The Idaho border is approximately 9 miles north of the town of Jarbidge. (US Ex. 710 at AR-015414.)



Figure 2: Excerpt from Exhibit B of US Ex. 710, showing the town of Jarbidge north of the South Canyon Road.

6.      The Jarbidge South Canyon — and, in turn, the South Canyon Road — is a small portion of the larger Jarbidge Area, which, as the term appears in this Order, describes the Jarbidge Mountains, including the entire Jarbidge Canyon, the Jarbidge River, and the East Fork of the Jarbidge River. (*See* US Ex. 710 at AR-015414 (similarly defining the "Jarbidge Area").)

///

**B.      Direct Evidence of Continuous Public Use of the South Canyon Road Before 1909**

7.      Aside from a contested map, the parties have not located any local, state, or federal governmental record showing that the South Canyon Road was placed in continuous public use before the Bruneau Addition was permanently reserved in 1909. (EC Ex. 1198.)

8.      The only direct evidence suggesting that a road or trail may have existed in the Jarbidge South Canyon is an 1894 map of Elko County drawn by E.C. McClellan ("1894 Map" or "the Map"). (EC Ex. 1191; *See* Tr. 834, 963-66, 1175-76, 1179.) The 1894 Map was produced two years before a General Land Office survey of the Jarbidge South Canyon; the northern portion of the map — which is at issue here — lacks any grid markers characteristic of areas that have been surveyed. (EC Ex. 1191; Tr. 120-21, 964.) The parties dispute the 1894 Map's accuracy.

9.      A river depicted by a solid line appears to bisect the northernmost boundary of the 1894 Map. (EC Ex. 1191; Tr. 113-14, 959-60; *see infra* Figure 3.) The river begins running in a northeastern direction and continues north to the Map's border. (EC Ex. 1191; Tr. 113.)



Figure 3: Excerpt of EC Ex. 1191 with an arrow pointing out the river in question, which sits about halfway between either side of the Map.

10.    As the river moves south, a dotted line begins to appear alongside it. (EC Ex. 1191; *see infra* Figure 4.) The dotted line continues to run to the south even after the solid line ends, eventually reaching the drainage of the Humboldt River. (EC Ex. 1191; Tr. 114.) According to the Map's legend, a dotted line designates a road. (EC Ex. 1191.)



Figure 4: Excerpt of EC Ex. 1191, showing the dotted line running alongside the river.

11.    Although the river feature is not clearly labeled on the map, a smudged "B" appears to the left of the northern starting point of the dotted line. (EC Ex. 1191.) The "B" appears to be the beginning of a more-smudged label, which seems to read "Bruneau." (EC Ex. 1191; *see infra* Figure 5.) The Bruneau River is a separate river approximately 10 miles west of the Jarbidge River. (EC Ex. 1193.) The Bruneau River runs in a northeastern direction near the northern border of Elko County. (EC Ex. 1193.)

///

///

///

///

1
2
3
4
5
6
7
8



9  Figure 5: Excerpt of EC Ex. 1191, showing the smudged "B" along the river. This image

10  has been rotated to the right by 90 degrees.

11       12.    The Jarbidge River, however, also runs north at the northern border of Elko

12  County. (EC Ex. 1193; Tr. 963.) And the Jarbidge River shares similar topography to the

13  river depicted in the middle of the 1894 Map. (Tr. 961-62, 964-65.) But even in light of

14  this similarity, an Elko County witness testified that the river depicted on the Map is

15  several miles west of the Jarbidge River's correct location — there appears to be a

16  "three-mile offset on the 1894 McClellan Map." (Tr. 966 (explaining that the Jarbidge

17  River "should be dr[a]wn three miles farther to the east than it is," but testifying that the

18  river is likely the Jarbidge).)

19       13.    The dotted line is just below the word "Mardis," which appears twice near

20  the road on the Map: first, in all-capital letters to the west of — and perpendicular to —

21  the road, and second, in italicized letters running almost parallel to the road to the east.

22  (EC Ex. 1191; *see supra* Figure 4.) Mardis was an established mining district before

23  1894. (Tr. 1212-13.) The Mardis district is near a town now known as Charleston, which,

24  on modern maps, appears several miles to the southwest of the Jarbidge South Canyon.

25  (EC Ex. 1196; US Ex. 112; Tr. 1213; *see* Tr. 818 (describing Mardis and Charleston as

26  "in the same vicinity"). *But see* Tr. 946 (asserting that the town of Mardis and the town of

27  Charleston are six or seven miles apart).) The Mardis mining district was not in the

28  Jarbidge Canyon. (Tr. 820.)

14.     As of 1894, an established toll road named the Mardis Toll Road ran in a northeastern direction from Gold Greek to the Bruneau River. (Tr. 1213-15, 1464; US Ex. 710 at AR-015451; US Ex. 9.) A claim for the Mardis Toll Road — along with a description of its location — was made with the Elko County Recorder's Office. (Tr. 1440-41.) The claim states that the Mardis Toll Road "terminate[s] at a point on the Bruno [sic] River at the Mouth of the Young America Gulch." (ECF No. 591-1 at 4; *see* US Ex. 9.)

15.     The 1894 Map also identifies Mary's River Peak, which appears approximately 10 miles east of the river at issue. (EC Ex. 1191, Tr. 1218, *see infra* Figure 6.) In modern maps, however, Mary's River Peak appears approximately one mile east of the headwaters of the Jarbidge River, near the Jarbidge South Canyon. (Tr. 1216-17; EC Ex. 1019.) Mary's River Peak is about 11 miles east of the Bruneau River. (Tr. 1217; EC Ex. 1019; EC Ex. 1193.)



Figure 6: Excerpt from EC Ex. 1191, showing Mary's River Peak in proximity to the river at issue on the 1894 Map.

16.     In light of these inconsistencies, the Court finds that the 1894 Map does not accurately depict a road running along the Jarbidge River. Instead, the Map appears to show the known Mardis Toll Road, which ran to the Bruneau River.

### C.    Other Possible Evidence of Continuous Public Use of the South Canyon Road Before 1909

17.    Elko County presented extensive evidence of various activities in the Bruneau Addition and the Jarbidge Area prior to 1909, including sheep grazing, prospecting, and other commerce. For example, there is no dispute that more than half a million sheep were in the Bruneau Addition by 1908. (EC Ex. 1198.) But these activities occurred either across the Bruneau Addition — which encompassed approximately 1,000 square miles (Tr. 326-27) — or were generally within the Jarbidge Area. This indirect evidence does not establish continuous public use specifically of the Jarbidge South Canyon before 1909.

#### 1.    Visitors to the Jarbidge South Canyon Before 1909

18.    The evidence indicates that a handful of visitors passed through the Jarbidge South Canyon — or the nearby area — before 1909. There is no evidence, however, that those visitors engaged in continuous public use of a trail or other thoroughfare through the Jarbidge South Canyon.

##### a.    Frank H. Winter

19.    In 1894, prospector Frank H. Winter and several associates filed two placer mining claims in the Jarbidge South Canyon. (US Ex. 710 at AR-015454; EC Ex. 1040; EC Ex. 1194;[8] Tr. 845-46.) Winter named the claims the Avalanche Placer Mine ("Avalanche") and the April Fool Mine ("April Fool"). (EC Ex. 1040 at 571, 576.) The

///

///

///

---

[8]Elko County Exhibit 1194 is a map created by Elko County witness Michael Price. (EC Ex. 1194; Tr. 418.) The exhibit includes several pages, but lacks internal page numbers. The third page of the map packet shows Winter's Avalanche and April Fool claims. (EC Ex. 1194.) The page also depicts a magenta line running along the Jarbidge River; the line is meant to mark "Historic Trails." (*Id.*) Michael Price has admitted that the magenta lines reflect "trails that we've modeled that *might have been used* to travel back and forth between the Mary's River Basin and Jarbidge." (Tr. 418 (emphasis added); *see* Tr. 453-54.) Because these magenta lines are speculative and not historical, the Court will not rely on Elko County Exhibit 1194 as proof that a trail existed in the Jarbidge South Canyon. The Court has considered the exhibit, however, for its mapping of mining claims along the Jarbidge River.

Avalanche claim, which was located on April 9, 1894, began at the intersection of Pine Creek and the Jarbidge River, and continued south for two miles. (*Id.* at 571.) The Avalanche claim was 1/8 of a mile wide (*id.*); it covered the portion of the South Canyon Road between Pine Creek and Snowslide Gulch. (Tr. 852-53.) The April Fool claim similarly ran for two miles on the Jarbidge River, beginning at a point approximately 2.5 miles from the upper Wilkins crossing, which appears to be a route known at the time as the Deer Creek Trail. (EC Ex. 1040 at 576; *see* US Ex. 710 at AR-015431.)

20.     Because the April Fool claim was based on a less accurate geographic marker, it is less clear whether the April Fool claim covered the remaining northern section of the South Canyon Road. (Tr. 851-52.) Elko County's witnesses have provided conflicting testimony on whether the April Fool claim ran from the intersection of Pine Creek and the Jarbidge River (which is the northern starting point of the Avalanche claim) north to the Pavlak Grade area — that is, whether the two claims combined covered the entirety of the South Canyon Road in dispute. (Tr. 849-52; *compare* EC Ex. 1086 (2006 exhibit showing the April Fool and Avalanche claims covering the length of the South Canyon Road) *with* EC Ex. 1194 (2015 exhibit showing only the boundaries of the Avalanche claim, but not the April Fool claim).) In light of this conflicting testimony, the Court finds that the April Fool claim covered some portion of the Jarbidge South Canyon floor in the two miles north of the Avalanche claim. (Tr. 852-53; EC Ex. 1040 at 576; EC Ex. 1194.)

21.     To claim both the April Fool and Avalanche claims, Winter and his party filed documents with the Elko County Recorder. (EC Ex. 1040.) Those documents, which were recorded on April 26, 1894, make no mention of a road or trail along the South Canyon floor. (*Id.*; Tr. 848-49.)

///

///

///

///

22.     The Winter party's 1894 mining claims are the first evidence of people of European descent in the Jarbidge South Canyon. (Tr. 846-47, 1229-30.) Indigenous people, however, were present in the general Jarbidge Area well before 1894. (Tr. 1109; US Ex. 710 at AR-015454.)

23.     In a statement written nearly 30 years after locating the April Fool and Avalanche claims, Winter stated that he and his team prospected the Jarbidge Area in 1891 and again in 1892. (EC Ex. 1039; Tr. 846.) Winter states that he "located some placer claims on the Jarbidge River and Pine Creek" on April 18, 1892. (EC Ex. 1039.) That date contradicts the April 9, 1894, date that appears on the recorded Avalanche and April Fool claims. (*See* EC Ex. 1040 at 571, 576; Tr. 661 (Elko County witness William Price stating that Winter was "a little bit off on the dates").) Winter further recounts that he located those claims with F. Lancaster in 1892. (EC Ex. 1039.) But Lancaster is not listed on any of Winter's recorded mining claims. (*See* EC Ex. 1040.) Given these contradictions, it appears more likely that Winter located the placer claims in 1894, not 1892.

24.     According to Winter's 1924 statement, he and his team failed to find enough gold in and along the Jarbidge River to continue prospecting their claims in the area. (EC Ex. 1039; *see* US Ex. 710 at AR-015431 to AR-015432.) No records indicate that Winter or his colleagues did additional work on the claims after filing them in 1894. (Tr. 855-56; US Ex. 710 at AR-015432 ("No records showing improvements to the claims have been located at this time.").) By 1909 to 1910, both the Avalanche claim and the April Fool claim were filed over by other miners. (EC Ex. 1198.)

### b.     Dennis Scully

25.     In 1896, Dennis Scully surveyed the 9th Standard Parallel as part of a contract project with the General Land Office. (Tr. 32; *see* TWS Ex. AR-6243X.) He crossed the Jarbidge South Canyon during that survey, just south of Fox Creek and Gorge Gulch. (Tr. 32-33, 1373; US Ex. 710 at AR-015419.) Scully documented this survey with thorough field notes. (Tr. 34.)

26.     According to the General Land Office's 1894 instructions, "[r]oads and trails, with their directions, whence and whither," were "required to be noted" by government surveyors like Scully. (US Ex. 53 at 58-59.) Scully did not note a road or trail when he crossed the Jarbidge South Canyon. (Tr. 39-46, 48-50; US Ex. 59-B; US Ex. 726.)

27.     In the other 66 miles of his survey, Scully noted roads 15 times, and noted trails 7 times. (Tr. 38-39.) The closest noted road to the Jarbidge South Canyon was 17 miles away. (Tr. 39.) Scully did not, however, call out Winter's 1894 mining claims. (*See* Tr. 1375-76.)

28.     Some possible discrepancies or inaccuracies in Scully's work have been noted. First, the General Land Office repeated the 9th Standard Parallel survey between 1935 and 1936. (Tr. 55-56, 83-84.) Although it is a routine practice to repeat an earlier survey (Tr. 55-56), the later survey revealed that Scully's standard parallel line ran between 10 and 100 feet north of the 1936 line. (Tr. 84, 93-94.) Second, Scully recorded his observations in tablets, which he later transcribed into his field notes. (TWS Ex. AR-6243X; Tr. 89-90.) Then, based on his field notes, Scully drafted a plat, which was later finalized by a draftsperson with the General Land Office. (Tr. 89-90.) It is possible that discrepancies between field notes and the plat would arise through the drafting process, including the failure to record features noted by the surveyor on the final plat. (Tr. 89-90.) Third, Scully's notes indicate that the Jarbidge terrain was "some of the roughest country in the United States," and was difficult to survey. (US Ex. 710 at AR-015420.) A newspaper article published 18 years later suggests that Scully required assistance from a Mr. Baker to continue west after his party had entered the Jarbidge South Canyon. (*Id.* at AR-015421; Tr. 1367-72.) There are no other references to Mr. Baker's alleged role in helping the Scully survey, or to any regular activity that he conducted in the Jarbidge South Canyon. (Tr. 1444-45.)

///

///

29.     Even in light of these discrepancies or possible inaccuracies, the Scully survey shows no road or trail in the Jarbidge South Canyon as of 1896 even though he did note roads and trails within the other surveyed areas.

### c.     William Perkins and William Mahoney

30.     In 1903, William Perkins constructed a cabin (the "Perkins Cabin") in the Jarbidge Canyon, approximately 200 feet north of the intersection of the Deer Creek Trail and the Jarbidge River. (TWS Ex. AR-9873; US Ex. 710 at AR-015422.) The Perkins Cabin was several miles north of the Jarbidge South Canyon. (Tr. 1314-15; *see* EC Ex. 1196.) Perkins used the Cabin throughout the summers of 1903 and 1904, irrigated the land with a ditch, and then sold these improvements to William Mahoney.[9] (TWS Ex. AR-9873.) The Perkins Cabin later became the site of the Mahoney Ranger Station. (Tr. 1314; TWS Ex. AR-9767; *see* EC Exs. 1019, 1196 (depicting the Mahoney ranger site).)

31.     Perkins filed a possessory land claim with Elko County in 1904. (EC Ex. 1042A at 188.)[10] Perkins claimed to have possessed the land beginning on December 1, 1902. (*Id.*)

32.     A 1904 plat map (the "1904 Map") drawn by E.C. McClellan — the same illustrator of the 1894 Map discussed above — depicts Perkins's 1904 land claim along the Jarbidge River. (US Ex. 101.)[11] Perkins's land claim is north of the Jarbidge South Canyon. (*Id.*) A trail shown on the 1904 Map runs east from Perkins's claim to other land claims along the East Fork of the Jarbidge River, and then south through the Mary's River Basin. (*Id.*) Although the 1904 Map shows a trail running in an east-west direction

_____

[9] Some sources refer to the Perkins Cabin as the "Mahoney Cabin" because Mahoney purchased the cabin from Perkins. (*See, e.g.*, TWS Ex. AR-8706.) For clarity, the Court will uniformly refer to the cabin as the "Perkins Cabin."

[10] Elko County Exhibits 1042A and 1042B list possessory land claims in the Jarbidge Area. The parties have stipulated that those exhibits, along with the testimony of Elko County witness William Price, accurately list the individuals who filed the possessory land claims contained in those exhibits, the dates of those claims, and their approximate boundaries. (EC Ex. 1198.)

[11] The parties have also stipulated that the approximate boundaries and locations of the land claims depicted on United States Exhibit 101 are correct. (EC Ex. 1198.)

across Perkins's land claim, no road or trail appears along the Jarbidge River in the Jarbidge South Canyon. (*See id.*)

33.     A map created by the U.S. Forest Service in 1909 similarly shows a trail running east to west near the Perkins Cabin. (TWS Ex. AR-8706; *see infra* Figure 7.) No road is depicted along the Jarbidge River. (*Id.*)

34.     Some secondary sources suggest that Perkins prospected the Jarbidge Canyon in 1892. (*See, e.g.*, EC Ex. 1023 Section D-3 (handout stating that Bill Mahoney occupied the Perkins Cabin in 1892); EC Ex. 1032 at 68 (asserting that the cabin was constructed in 1892); EC Ex. 1039 (statement by Frank Winter, asserting that "[a]bout this time [perhaps around 1892] Wm Perkins came in and prospected for several years").) Because these secondary sources conflict with the primary documents described above, the Court finds them less than credible. (*See* US Ex. 710 at AR-015422 n.51; Tr. 1201-02, 1247.) Nevertheless, even assuming those sources are correct, the evidence regarding the Perkins Cabin and land claims does not demonstrate that any road or trail ran through the Jarbidge South Canyon as of 1892 or 1904.

35.     In 1910, Perkins was reported to be at a different cabin in the Foster Camp, which was located at the head of the Jarbidge South Canyon. (Tr. 878, 1249-51; EC Ex. 1050 at 19-21; US Ex. 710 at AR-015422.) There is no evidence that Perkins was present at the Foster Camp before August 1910. (Tr. 878, 1251.)

36.     William F. Mahoney — who purchased the Perkins Cabin in 1905 — was involved in the sheep industry in Elko County. (US Ex. 710 at AR-015423 to AR-015424.) Like Perkins, Mahoney had also filed a possessory land claim in the Jarbidge Area in 1903. (EC Ex. 1042A at 179.) The claim ran near Mary's River, south of the Mary's River Basin. (*Id.*; US Ex. 101.)

37.     Elko County witness William Price testified that there was "only one practical way" for Mahoney to travel between the Mary's River land claim and Perkins Cabin — "[o]ver the Mary's River Summit and into the Jarbidge Canyon." (Tr. 702.) Price then conceded that despite the purported ease and convenience of traveling up the

Jarbidge South Canyon from the south, there were "plenty of ways" to travel between those two sites. (Tr. 702.)

38.     One such route is shown on the 1904 Map, which depicts a trail running north from the Mary's River Basin, where Mahoney's claim was located. (US Ex. 101.) The trail then moves west across the Jarbidge River, bisecting Perkins's land claim. (*Id.*) That crossing was known as the Deer Creek Trail or the Jarbidge Crossing. (Tr. 1241-42.) The 1904 Map does not show any trail running along the Jarbidge South Canyon between Mahoney's Mary's River claim and Perkins's claim. (US Ex. 101.)

### 2.     Other Relevant Land and Mining Claims

39.     In addition to Winter, Mahoney, and Perkins, several other parties sited land or mining claims in and around the Jarbidge Canyon.

### a.     David Bourne and John Escalon

40.     David Bourne set off a mining boom in the Jarbidge Canyon in the summer of 1909. (US Ex. 710 at AR-015435 to AR-015436.) In June 1909, he located claims in an area later known as Bourne Gulch, which is a few miles north of the Jarbidge South Canyon; Bourne filed mining claims with Elko County in September 1909. (*Id.* at AR-015435; EC Ex. 1019.) He located additional claims in August 1909, and recorded them with Elko County in November 1909. (US Ex. 710 at AR-015435.)

41.     According to several secondary sources, Bourne was prospecting near the Jarbidge Canyon as early as 1908. (EC Ex. 1023 Section D-3; TWS Ex. AR-9445X at AR-009460; US Ex. 710 at AR-015435; Tr. 516-17.) One such source was a January 1910 article from the *Elko Free Press*, which reported Bourne as claiming that in November 1908, he and his wife reached the Jarbidge River from the south and continued "to a point nine miles from the Idaho line." (Tr. 629 (quoting US Ex. 202 at AR-9028).) In his 1924 manuscript, Winter — whose mining claims were discussed above — wrote that he encountered Bourne in Mountain City in the fall of 1908. (EC Ex. 1039.) Mountain City is approximately 30 miles west of the Jarbidge Mountains. (Tr. 831.) Furthermore, the year listed in the Winter manuscript, which is handwritten, appears to

1   have been corrected — it could read either 1908 or 1909. (EC Ex. 1039.) Even
2   assuming that Bourne visited the Jarbidge Canyon in 1908, this evidence does not
3   establish that he made frequent use of a route through the Jarbidge South Canyon.

4       42.   While discussing the 1910 *Elko Free Press* article about Bourne, Elko
5   County witness William Price testified that Bourne and his wife could have reached the
6   Jarbidge Canyon in November 1908 by traveling north over the Mary's River Basin and
7   through the Jarbidge South Canyon, or by coming in "somewhere north of the Jarbidge
8   Mountains and then work[ing] [their] way back south along the Jarbidge River." (Tr. 629-
9   30.) But Price clarified that the route over Mary's River Basin would have been
10  impossible to pass if heavy snow had fallen. (Tr. 630, 634-35.) Price also testified that he
11  failed to find any documents showing that Bourne and his wife entered the Jarbidge
12  Canyon through the southern head of the canyon. (Tr. 826.) And Winter's 1924
13  manuscript states that in the fall of 1908, Bourne was in Mountain City, approximately 30
14  miles west of the Jarbidge Mountains. (EC Ex. 1039; Tr. 831.) In short, whether Bourne
15  reached the Jarbidge Canyon from the north or the south is ambiguous at best.

16      43.   John Escalon similarly located mining claims in the summer of 1909 near
17  the Jarbidge Canyon, where he had traveled from Charleston. (EC Ex. 1039; TWS Ex.
18  AR-9445X at AR-009460.) A 1910 article in the *Elko Free Press* indicates that Escalon
19  traveled from the headwaters of the Bruneau River along the west side of the Jarbidge
20  Mountains before dropping into the north end of the Jarbidge Canyon, north of the
21  Jarbidge South Canyon. (TWS Ex. AR-9062 at AR-009064; Tr. 1272.) The evidence
22  does not show that Escalon traveled through the Jarbidge South Canyon, let alone that
23  he used a route through the Jarbidge South Canyon.

24  ///
25  ///
26  ///
27  ///
28  ///

1

### b. Individual Mining and Land Claims Near the Jarbidge South Canyon

44.     Although other mining and land claims were located near the Jarbidge South Canyon prior to 1909, they do not demonstrate continuous public use of any route through the Jarbidge South Canyon.

45.     The Jaw Bridge claim was located in September 1901 north of the Jarbidge South Canyon, "where the trail cross[es] the creek from Anunicau canyon to Wilkins Island." (EC Ex. 1040; Tr. 806-09.) The claim was not in the Jarbidge South Canyon, nor did it describe any trail, road, or thoroughfare running through the Jarbidge South Canyon. (*See* EC Ex. 1040; EC Ex. 1194.) Instead, the claim was near the known Deer Creek Trail, which crossed the Jarbidge River in an east-west direction north of the Jarbidge South Canyon. (EC Ex. 1194.)

46.     In 1904, R.H. Mallett also located a land claim near the Deer Creek Trail. (*See* US Ex. 101.) The Mallett claim was just south of Perkins's land claim, and south of the Deer Creek Trail. (*See supra* Section III.C.1.c (describing Perkins's claims); US Ex. 101; EC Ex. 1194.) Like the Jaw Bridge and Perkins claims, the Mallett claim could be accessed from the west side of the Jarbidge Mountains or the East Fork of the Jarbidge River via the Deer Creek Trail. (US Ex. 101; Tr. 874-76.)

### 3. Sheep Grazing in the Jarbidge Area

47.     The Jarbidge Area was used for sheep activities before the Bruneau Addition was reserved in 1909. In 1895, approximately 331,500 sheep grazed throughout Elko County, an increase from the approximately 85,000 sheep present in 1890. (Tr. 250-51; EC Ex. 1029 at 59.) As of 1908, the number of sheep in the Bruneau Addition had increased to about 800,000. (Tr. 254-55, 326.) Assuming 800,000 sheep in the area, about 319 sheep herders and camp tenders would have been present in the Bruneau Addition. (Tr. 254-55, 300-01, 326-27.) The Forest Service, however, estimated that there were approximately 390,000 sheep in the Bruneau Addition in 1906, and, by 1908, the number had risen to 560,000. (EC Ex. 1198.) The Bruneau Addition covered about 1,000 square miles. (Tr. 326-27.)

48.     Typically, sheep graze in the low country during the winter and move to higher ground — with more green for grazing — in the summer. (Tr. 230.) Sheep tend to spread out as they move across the land, rather than traveling along a route or trail. (Tr. 233.) Bands of sheep can reach about a half mile when they are spread out. (Tr. 233.)

49.     Although sheep would graze throughout the Jarbidge Mountains, there is no direct evidence indicating that sheep, sheep herders, or their attendants were in the Jarbidge South Canyon. (Tr. 326-30; 1407-11.) Given the number of sheep in the Bruneau Addition, however, it is possible that sheep entered the Jarbidge South Canyon before the 1909 reservation. (Tr. 1407-11.)

50.     Sheep grazing was permitted along parts of the Jarbidge River after the Bruneau Addition was reserved as a national forest in 1909. (US Ex. 234 at AR-009380.) But no evidence shows continuous use of the Jarbidge South Canyon for grazing purposes before 1909.

### 4.    Presence of Native Americans in the Jarbidge Area

51.     Although Native Americans were present in the Jarbidge Area well before 1909, there is no direct evidence that they continuously used the Jarbidge South Canyon.[12] (US Ex. 710 at AR-015415 to AR-015416.) After searching the Jarbidge South Canyon for evidence of prehistoric use, TWS witness Frederick Frampton testified that he found "one very, very, very small site" of interest. (Tr. 1224.) The site consisted of "four flakes," which were a byproduct of the crafting of a prehistoric knife that took about ten seconds to create. (Tr. 1224.) Evidence of Native American use of the Jarbidge Mountains over the past 300 years also exists, but no such evidence has been discovered in the Jarbidge South Canyon. (Tr. 1225-26; US Ex. 710 at AR-015415 to AR-015416.)

///

---

[12]It is not clear to the Court that prehistoric or indigenous use of the Jarbidge South Canyon would be appropriate evidence of an R.S. 2477 right-of-way. In any event, no evidence suggests that indigenous people made continuous use of the Jarbidge South Canyon.

52.     Various newspaper articles from the 1890s and early 1900s report that Native Americans avoided the Jarbidge South Canyon because a legend placed a devil or giant there. (Tr. 1087-92; US Ex. 710 at AR-015417 to AR-015418; *see* EC Ex. 1039 at 4.) It is not clear where this legend originated. According to Elko County witness Cydnee McMullen, it could have come from Native American people, or from colonizers who may have used the story in an attempt to justify exploiting native populations. (Tr. 1091-92.) TWS witness Frederick Frampton, however, believes that the legend arose from Native Americans, based on his interactions with Shoshone tribe members. (Tr. 1227-28.) Aside from the legend, Frampton further testified that Native Americans may have avoided the Jarbidge South Canyon because of its inaccessibility and heavy woods. (Tr. 1228.) These factors further support the conclusion that Native Americans did not make continuous use of the Jarbidge South Canyon before 1909.

### 5.     Newspaper Accounts, Maps, and Other Documents

#### a.     Newspaper Accounts

53.     The parties presented many newspaper articles throughout the evidentiary hearing. (*See, e.g.*, Tr. 600-31, 1075-90.) Those articles generally help in describing activities occurring in Elko County and the Jarbidge Area. With regard to the Jarbidge South Canyon, the parties agree that there are a number of newspaper accounts appearing in Elko County newspapers including the *Elko Daily Free Press*, the *Gold Creek News*, the *Nevada State Herald*, and the *Metropolis Chronicle* that describe the Jarbidge Area as mountainous, steep and rugged, or words to that effect, prior to the January 1909 reservation. (EC Ex. 1198.) For example, an 1897 article in the *Gold Creek News* described the Jarbidge Canyon as "a total blank" and "one of the least known portions of the country." (TWS Ex.-AR6862; Tr. 1230-31.)

54.     The newspaper articles do not, however, describe a road or trail in the Jarbidge South Canyon before January 1909.

///

///

### b.    Relevant Maps

55.    In addition to the 1894 Map discussed above (*see supra* Section III.B), the 1904 Map by McClellan depicts land claims along the Jarbidge River and its East Fork, including the Perkins and Mallett claims north of the Jarbidge South Canyon. ((US Ex. 101.) The 1904 Map does not show any trail or road through the Jarbidge South Canyon. (*Id.*) Instead, the trails depicted run to the west of the Jarbidge Mountains, to the east of the East Fork of the Jarbidge River, and across the Jarbidge River in an east-west direction north of the Jarbidge South Canyon. (*Id.*) The east-west trail is the Deer Creek Crossing. (Tr. 1243.)

56.    If the 1894 Map depicted a trail along the Jarbidge South Canyon, that trail does not appear on the 1904 Map. The 1904 Map thus bolsters the Court's conclusion that the 1894 Map does not depict a trail running through the Jarbidge South Canyon.

57.    McMullen, an Elko County witness, testified that a 1908 map drawn by John Haws ("Haws Map"), an Elko County surveyor, might show whether a road or trail existed in the Jarbidge South Canyon before 1909. (Tr. 1083-84, 1175-76.) But McMullen has not located the map, and Elko County did not offer it as evidence in this proceeding. (*See* EC Ex. 1185 ("Elko County is still searching for Map.").) The fact that the Haws Map may have existed does not establish that the Jarbidge South Canyon was continuously used by the public as of 1908.

58.    Indeed, a 1909 map drawn by the United States Forest Service ("USFS Map") shows the Mahoney Ranger Station (formerly the Perkins Cabin), just north of the Jarbidge South Canyon. (TWS Ex. AR-8706; *see infra* Figure 7.) The USFS Map shows the Deer Creek Trail crossing the Jarbidge River from east to west near Perkins Cabin. (*Id.*) No road or trail appears parallel to the Jarbidge River.

///

///

///

///



Figure 7: Excerpt of TWS Ex. AR-8706, depicting a west-to-east trail near the Perkins Cabin.

59.     The following year, W.W. Fisk issued a map ("Fisk Map") of surveyed and unsurveyed land claims along the Jarbidge River. (US Ex. 177 at AR-008728.) Unlike the USFS Map, this 1910 map does not identify any trails or roads. (*Id.*) Mineral survey mapping guidelines at the time required mineral surveys to identify all topographical markers like roads and trails. (US Ex. 178 at AR-08557.) But the Fisk Map was not itself a survey — instead, it compiled both surveyed and unsurveyed claims in the region. (Tr. 170.) It is not clear whether Fisk would have been required to note roads and trails on the map. (Tr. 170.) Even assuming that Fisk erred by failing to identify known roads or

1  trails, those mistakes do not demonstrate that other government maps — such as

2  Scully's survey of the 9th Standard Parallel — were similarly flawed.

3       60.     Maps drafted in the years following the 1909 mining boom show a road

4  running through the Jarbidge South Canyon. (*See, e.g.*, US Ex. 710 at Ex. L (1911 map

5  showing a "River Road" running parallel to the Jarbidge River in the Jarbidge South

6  Canyon).)

7                          **c.     Other Documents**

8       61.     The parties agree that between the summer of 1909 and April 1910, after

9  the mining boom had begun, more than 500 mining claims were located and filed in the

10 Jarbidge Area. (EC Ex. 1198.) As a result, all — or almost all — of the Jarbidge South

11 Canyon was covered by mining claims after April 1910. (*Id.*)

12      62.     There is no evidence of a Forest Service permit for a trail or road through

13 the Jarbidge South Canyon after the Bruneau Addition was reserved in 1909. (US Ex.

14 711 at AR-015159.) The 1908 Forest Service regulations, however, required only the

15 "consent" and supervision of a Forest Service officer for constructing a trail. (US Ex. 166

16 at AR-008319.) Similarly, wagon roads constructed by states or counties — but not by

17 private parties — did not require permits. (*Id.*) Under the 1905 regulations, miners could

18 construct roads within their claims without a mining permit. (*See* US Ex. 711 at AR-

19 015159 to AR-015162; US Ex. 111 at AR-007722 to AR-007723.)

20                          **6.     Expert Opinions**

21      63.     McMullen, who is a historian, concluded that there is a "strong possibility of

22 a trail in the" Jarbidge South Canyon. (Tr. 1174; *see* Tr. 1055-57 (qualifying McMullen as

23 an expert in general history but deferring request to qualify McMullen as an expert on

24 "sense of place" and "how people use their environment"[13]).) She based this conclusion

25 primarily on historic patterns of travel in "rugged[,] mountainous areas." (Tr. 1174-75.)

26 Typically, McMullen testified, people use waterways for travel both to sustain themselves

27 _____

28      [13]Qualification in the latter two categories is unnecessary as the Court assigns
little weight to McMullen's testimony in these categories.

and as a means of marking routes through difficult terrain. (Tr. 1175.) Moreover, miners with placer claims in the Jarbidge Canyon would have been interested in the Jarbidge River, and, in her opinion, likely would have used the River to travel through the Jarbidge Canyon. (Tr. 1175.)

64.     McMullen also explained that significant commerce occurred near railroad stops in the region, including Deeth, which is approximately 50 miles south of Mary's River Peak. (*See* Tr. 527, 1058, 1100-01.) Deeth was an important area for restocking for cattlemen and sheep grazers in the Jarbidge Area, and was the source of large numbers of sheep and cattle that entered the Bruneau Addition. (Tr. 1100, 1132.) McMullen, however, testified that none of the articles or other sources she reviewed discussed a specific route from Deeth through the Jarbidge South Canyon. (Tr. 1181-82.)

65.     McMullen further assumed that the road depicted on the 1894 Map ran along the Jarbidge River, even in light of the Map's inaccuracies. (Tr. 1175.) McMullen testified that, as a historian, she "would not draw a conclusion that because there is no map; therefore, there was no trail or route."[14] (Tr. 1176.)

66.     Elko County witness Michael Price, an expert in GIS mapping, testified that the easiest route from Deeth to Jarbidge would have run through the Jarbidge South Canyon. (Tr. 478-79.) Assuming that a traveler took the Mary's River corridor north from the Deeth area, Price asserted that the "most direct, safest route" would continue north along Mary's River and through the Jarbidge South Canyon to the Jarbidge River. (Tr. 478; *see* EC Ex. 1089 (tracing a yellow line along this proposed route); EC Ex. 1194 (showing the proposed route with a magenta line).) Price's assessment was "primarily gained by digital analysis" of the region — he had no evidence that this proposed route was used prior to 1909. (Tr. 478, 483.)

///

---

[14]McMullen's testimony may reflect a historian's approach, but not that of a court, which must view the evidence presented under an established standard of proof.

**D.    Evidence That the South Canyon Road Was Constructed After 1909**

67.    A road in the Jarbidge South Canyon begins to appear on maps and other documents after Bourne set off a gold rush in the Jarbidge Canyon in the fall of 1909. (*See* US Ex. 710 at AR-015435, AR-015448.) Prior to 1909, the only known trail near the Jarbidge South Canyon was the Deer Creek Trail, which met the Jarbidge River near the Perkins Cabin, which, as noted above, was north of the Jarbidge South Canyon. (*Id.* at Ex. G, AR-015441 to AR-015442.)

68.    A 1912 report on the mining boom described the widespread travel to the Jarbidge camp — which was several miles north of the Jarbidge South Canyon (*see* US Ex. 710 at Exs. B, L; EC Ex. 1089) — as "remarkable, for there were no established lines of transportation and no wagon road within 12 miles of the camp." (TWS Ex. AR-9445X at AR-009461.) As prospectors entered and extended into the Jarbidge South Canyon between 1909 and 1910, a road was developed between the Jarbidge mining camp and "the Hub," a group of mining claims at the intersection of Fox Creek and the Jarbidge River to the south. (US Ex. 710 at Ex. L, AR-015449; *see* TWS Ex. AR-9442X.) As of December 1910, the road had been extended 2 miles south of Fox Creek. (US Ex. 710 at AR-015449; TWS Ex. AR-5269.) A trail continued farther south, from Fox Creek to an area known as Foster Camp. (TWS Ex. AR-9422X; TWS Ex. AR-9445X at AR-009457; Tr. 1457.)

**IV.    CONCLUSIONS OF LAW**

Before its 1976 repeal, R.S. 2477 granted "[t]he right of way for the construction of highways over public lands[] not reserved for public uses." *See* 43 U.S.C. § 932 (repealed 1976). Rights-of-way that existed before R.S. 2477's repeal remain intact. *Adams v. United States*, 3 F.3d 1254, 1258 (9th Cir. 1993). The statute "did not itself *create* R.S. 2477 roads; rather, it *authorized* the states to construct highways over public lands." *Lyon v. Gila River Indian Cmty.*, 626 F.3d 1059, 1077 (9th Cir. 2010). R.S. 2477 has thus been understood "as presenting a free right-of-way 'which takes effect as soon

///

1   as it is accepted by the State." *Mills v. United States*, 742 F.3d 400, 403 (9th Cir. 2014)

2   (quoting *Lyon*, 626 F.3d at 1077).

3        State law, in turn, controls whether and how a state may accept the right-of-way.

4   *Lyon*, 626 F.3d at 1077 (citing *Standage Ventures, Inc. v. Arizona*, 499 F.2d 248, 250

5   (9th Cir. 1974)). Once a highway is constructed under state law, R.S. 2477 automatically

6   granted a right-of-way for that road. *Id.* Acceptance of the right-of-way "requires merely

7   'some positive act on the part of the appropriate public authorities of the state, clearly

8   manifesting an intention to accept.'" *Id.* (quoting *Wilderness Soc'y v. Morton*, 479 F.2d

9   842, 882 (D.C. Cir. 1973)). The party claiming a right-of-way bears the burden of

10  establishing its existence. *Id.* (citing *Shultz v. Dep't of Army*, 96 F.3d 1222, 1223 (9th Cir.

11  1996)). Here, as the party seeking a right-of-way, Elko County must show, by clear and

12  convincing evidence, that its alleged right-of-way existed before the Jarbidge South

13  Canyon was reserved as a national forest in 1909.[15] (ECF No. 507 at 7-8.)

14       Elko County effectively concedes, as it must, that no mechanical construction of a

15  highway occurred before 1909. (*See* ECF No. 521 at 10-12.) Instead, the County

16  proceeds under a theory of public use, arguing that enough public use of the South

17  Canyon Road occurred before 1909 to have signaled the acceptance of an R.S. 2477

18  right-of-way. (*Id.* at 10-14.) Although TWS disputes whether Nevada law even permitted

19  a right-of-way to be established through continuous public use in 1909,[16] they contend

20  that Elko County has failed to demonstrate any continuous public use of a route through

21  the Jarbidge South Canyon before 1909. (ECF No. 591 at 18-20.) The Court agrees.

22  ///

23  _____

24       [15]As discussed below, the Court finds that Elko County has failed to establish the existence of a right-of-way even under a preponderance of the evidence standard.

25       [16]TWS presented this argument in a motion for summary judgment (ECF No. 527)

26  that the Court denied (ECF No. 553). TWS has already requested the Court's reconsideration of that decision, and their request was denied. (ECF No. 553.) Accordingly, the Court will not reconsider whether, in 1909, a right-of-way could be established by continuous public use under Nevada law. Moreover, this argument is

27  irrelevant in light of the Court's finding that Elko County cannot show, by either clear and convincing evidence or a preponderance of the evidence, continuous public use of the

28  South Canyon before 1909.

### A.    Elko County Must Demonstrate a Right-of-Way Prior to 1909

As an initial matter, TWS argues that the Jarbidge South Canyon was reserved from public use before 1909, first by mining claims located in the South Canyon in 1894, and later by a temporary withdrawal of the Bruneau Addition in 1905. (ECF No. 591 at 19, 35-37.) Neither cut-off date unequivocally reserved the South Canyon Road from public use.

The relevant mining claims are the Avalanche and April Fool claims located by Frank Winter and his colleagues through almost the entirety of the Jarbidge South Canyon. (*See supra* Section III.C.1.a.) There is some dispute over the precise reach of the April Fool claim, and whether the two claims combined to cover the entire span of the South Canyon Road. (*See* EC Ex. 1086; EC Ex. 1194.) The Court has found, however, that the April Fool claim covered at least some portion of the Jarbidge South Canyon in the two miles north of the Avalanche claim. (*See supra* Section III.C.1.a.) But the evidence does not establish that Winter's claims covered the entire 2.4-mile stretch of the South Canyon Road. The Court accordingly cannot conclude that the claims removed the relevant portion of the Jarbidge South Canyon from public use in 1894.

Even assuming that Winter's claims covered the 2.4 miles in dispute, the evidence indicates that Winter and his colleagues never improved the claims, which left them open to relocation. (*See supra* Section III.C.1.a.) An R.S. 2477 right-of-way can be created only while land retains its "public character." *Great Old Broads for Wilderness v. Kimbell*, 709 F.3d 836, 842 n.1 (9th Cir. 2013) (citing *Humboldt Cty. v. United States*, 684 F.2d 1276, 1281 (9th Cir. 1982)). Land loses its public character once a person's claim or right attaches to it. *Humboldt Cty.*, 684 F.2d at 1281 (citing *Columbia Basin Land Prot. Ass'n v. Schlesinger*, 643 F.2d 585, 602 (9th Cir. 1981)). By locating a valid mining claim, a prospector like Winter was granted "the exclusive right of possession and enjoyment of all the surface included within the lines of [the claim's] location[]." *United States v. Curtis-Nevada Mines, Inc.*, 611 F.2d 1277, 1281 (9th Cir. 1980) (quoting 30 U.S.C. § 26)). A properly located mining claim therefore "segregate[s] [the land] from the

1   public domain." *St. Louis Mining & Milling Co. v. Mont. Mining Co.*, 171 U.S. 650, 655

2   (1898).

3          The Avalanche and April Fool claims were recorded with Elko County in 1894.

4   (EC Ex. 1040 at 571, 576; *see supra* Section III.C.1.a.) Because locating the claims gave

5   Winter the right of possession and enjoyment of the surface of the property, the land

6   covered by the claims was no longer part of the public domain.[17] *See St. Louis Mining &*

7   *Milling Co.*, 171 U.S. at 655. But mining claims like Winter's could be abandoned or

8   forfeited under federal law, which required a minimum amount of work to be performed

9   on the claim annually. *See* 30 U.S.C. § 28; *Farrell v. Lockhart*, 210 U.S. 142, 148 (1908);

10  *Belk v. Meagher*, 104 U.S. 279, 281-82 (1881). Failing to perform the annual

11  assessment work jeopardized the mining claim's validity, such that the claim could be

12  forfeited.[18] *Farrell*, 210 U.S. at 148. Here, according to Winter's own account, neither he

13  nor his colleagues performed additional work on the Avalanche and April Fool claims

14  after locating them in 1894. (EC Ex. 1039.) Indeed, by 1909 and 1910, other prospectors

15  eventually located new claims over Winter's former claims. (EC Ex. 1198.) Because

16  _____

17          [17]Elko County suggests that Winter's claims were not proper because they were
        filed to preserve access to water for sheep herding, and not for mining. (ECF No. 592 at
18      41.) This practice was known as sheep mining. (*Id.*) But aside from generally arguing
        that sheep mining was considered fraudulent, and from pointing out that Winter was a
19      rancher, Elko County does not cite to any evidence suggesting that the Avalanche and
        April Fool claims were fraudulent. (*Id.* at 28-29, 41.) In any event, the Court need not
20      decide whether Winter's claims were valid because the Court finds that Winter effectively
        abandoned the claims by failing to improve them.

21          [18]There appears to be some uncertainty over whether the failure to perform
        annual work on a mining claim automatically forfeited the claim. In *Farrell*, the Supreme
22      Court considered a mining claim to be "forfeited for want of the annual labor required" at
        the close of the statutory period allotted for that work. 210 U.S. at 148. But the Court has
23      further explained that even if a miner failed to perform the requisite annual work, the
        miner could recover the forfeited claim by performing work after the statutory period, so
24      long as another individual had not staked a new claim on the land. *Belk*, 104 U.S. at
        282-83. The Court also clarified that the failure to perform annual work was not an "ipso
25      facto" forfeiture, but rather an action that opens the claim to relocation. *Ickes v. Virginia-*
        *Colorado Dev. Corp.*, 295 U.S. 639, 645 (1935), *disagreed with by Hickel v. Oil Shale*
26      *Corp.*, 400 U.S. 48, 56-58 (1970) (agreeing with *Ickes* that "every default in assessment
        work does not cause the claim to be lost," but disagreeing to the extent *Ickes* suggested
27      that only other private parties, and not the government, might benefit from the failure to
        perform work). Here, even if Winter's claims were not automatically forfeited, they were
28      subject to relocation due to Winter's failure to perform any work on them. More
        important, whether Winter's claims reserved the Jarbidge South Canyon is ultimately
        irrelevant in light of the Court's finding that no right-of-way existed before 1909.

Winter's claims could be considered forfeited as of January 1, 1896, *see Farrell*, 210 U.S. at 144 (finding that a claim located in August 1900 was forfeited for failure to perform annual work on December 31, 1901), the Court finds that the underlying land was not reserved from public use for R.S. 2477 purposes as of 1894.

TWS additionally contends that the 1905 temporary withdrawal of the Bruneau Addition should count as the cut-off date for Elko County's R.S. 2477 claim. (ECF No. 591 at 36-37.) In November 1905, the Secretary of the Interior withdrew "from all forms of disposition, excepting under the mineral laws, all of the vacant unappropriated public lands in the [Bruneau Addition] . . . with a view to the ultimate creation therefrom of the Independence Forest Reserve." (TWS Ex. AR-7841; ECF No. 519 at 3.) Such a withdrawal removes land from certain kinds of private appropriation under public land laws, "preserving the status quo while Congress or the executive decides on the ultimate disposition of the subject lands." *S. Utah Wilderness All. v. Bureau of Land Mgmt.*, 425 F.3d 735, 784 (10th Cir. 2005). A withdrawal thus differs from a reservation, which not only withdraws land, but also "dedicates [it] to a particular public use." *Id.* This language is tracked in R.S. 2477, which recognizes rights-of-way for highway construction over lands "not reserved for public uses."

It is not clear that the 1905 withdrawal qualifies as a reservation of public land for R.S. 2477 purposes. The withdrawal does explicitly state that its purpose is to prepare for "the ultimate creation . . . of the Independence Forest Reserve," suggesting that the withdrawal occurred to facilitate a particular public use of the land. (TWS Ex. AR-7841.) On the other hand, the withdrawal exempts from its reach any disposition of the lands "under the mineral laws." (*Id.*) The Ninth Circuit, in turn, has explained that R.S. 2477 was passed as part of a larger suite of laws designed to facilitate mineral development. *Humboldt Cty.*, 684 F.2d at 1281-82 (declining to extend an R.S. 2477 right-of-way to a county in part because the road's purpose "would be purely for recreation," not for mining or economic development). Because the 1905 withdrawal did not affect dispositions under the mineral laws, it seems that a right-of-way under R.S. 2477 —

1  which was passed in the context of an 1866 mining law — could have been established

2  regardless of the withdrawal. *See id.* But the Court need not decide whether the 1905

3  withdrawal reserved the Jarbidge South Canyon from public use. Instead, even

4  assuming that the temporary withdrawal did not foreclose the establishment of rights-of-

5  way under R.S. 2477, the Court finds that no right-of-way was created before the

6  Bruneau Addition was reserved to create a national forest in 1909.

### B.   Elko County Has Not Shown by Clear and Convincing Evidence that a Right-of-Way Existed Before 1909

9  Elko County claims that extensive public use of the Jarbidge South Canyon took

10  place before the Bruneau Addition was reserved as a national forest on January 20,

11  1909. Such public use, the County argues, was sufficient under Nevada law to qualify as

12  an "acceptance" of an R.S. 2477 right-of-way.[19] As the Tenth Circuit has explained, such

13  an acceptance was one of two steps required to establish a public right-of-way under

14  common law. *S. Utah Wilderness All.*, 425 F.3d at 769. The other step — "an express

15  dedication of the right of way by the landowner" — was satisfied by R.S. 2477 itself. *Id.*

16  Although states have different rules governing how a right-of-way might be accepted,

17  many western states provide for the acceptance of a right-of-way by "continuous public

18  use over a specified period of time." *Id.* at 770 (citing cases from Alaska, Nebraska, New

19  Mexico, Utah, and Wyoming). States have defined different periods of time for

20  continuous public use: some imported their rules on easements by prescription, others

21  established new rules specifically for R.S. 2477, and some used "simply a period long

22  enough to indicate intention to accept." *Id.* at 771 (citations omitted).

23  Equally important is the nature of the public use, which must be more than

24  random, "merely occasional," *id.* at 775 (quoting *Ball v. Stephens*, 158 P.2d 207, 211

25  (Cal. Ct. App. 1945)), or "infrequent and sporadic." *Id.* at 776 (citing *Hamerly v. Denton*,

26  359 P.2d 121, 125 (Alaska 1961)). Although states differ in terms of what activities

___

27

28  [19]This argument assumes that before January 20, 1909, Nevada law permitted the creation of a right-of-way through public use. (*See supra* note 16.)

qualify as sufficient public use, it is clear that "occasional or desultory use is not sufficient." *Id.* at 771. The Utah Supreme Court, for example, rejected a right-of-way for land traversed by a single cattleman who "herd[ed] his cattle across the lands of another to get to and from winter grazing land." *Id.* at 774 (citing *Cassity v. Castango*, 347 P.2d 834, 835 (Utah 1959)). The Montana Supreme Court similarly denied a right-of-way after witnesses testified that they had used a trail "perhaps 'once a year, twice a year, three times; not over that; maybe some years not at all.'" *Id.* at 775-76 (quoting *Moulton v. Irish*, 218 P. 1053, 1054 (Mont. 1923)).

Few cases in Nevada discuss the extent of public use required to establish a right-of-way under R.S. 2477. In *Anderson v. Richards*, 608 P.2d 1096, 1098-99 (Nev. 1980), the Nevada Supreme Court held that a valid right-of-way existed for a road under both federal and state law. Noting that "nearly every map introduced by the parties showed [the] roadway" at issue, the court concluded that "[t]he record leaves no doubt that there existed a road or trail from early pioneer days." *Id.* at 1097. As for the road's legal validity, the court reasoned that the road was in use before 1866, when Nevada first enacted legislation establishing the state's public highways.[20] *Id.* at 1099 (citing NRS § 403.410). The 1866 legislation recognized all existing public roads — including the road at issue in *Anderson* — as public highways. *Id.* The court further reasoned that the road was proper under R.S. 2477, suggesting that the statute "protect[ed] persons who had already encroached upon the public domain without authorization, but who had been allowed to remain there with the knowledge and acquiescence of the government." *Id.* at 1098. In discussing the breadth and import of R.S. 2477, the court cited a passage from the Colorado Supreme Court, which suggested that "user is the requisite element [under R.S. 2477], and it may be by any who have occasion to travel over public lands, ///

---

[20] The 1866 statute recognized "[a]ll public roads . . . in incorporated cities and towns in this state, used or lawfully entitled to be used as such on March 9, 1866," as public highways. *Anderson*, 608 P.2d at 1099 n.7 (quoting NRS § 403.410). The statute also declared as public highways roads that were opened after March 9, 1866, by "the board of county commissioners of the county in which they are situated." *Id.*

1   and if the use be by only one, still it suffices." *Id.* at 1098-99 (quoting *Brown v. Jolley*,

2   387 P.2d 278, 281 (Colo. 1963)).

3       Elko County points to *Anderson* in arguing that even sporadic use of land as a

4   trail or pathway may be sufficient to establish an R.S. 2477 right-of-way in Nevada. (*See*

5   ECF No. 592 at 37-38.) But the *Anderson* ruling hinged on extensive evidence that the

6   road at issue was well established, especially the fact that the road appeared on almost

7   every map introduced to the court. *See Anderson*, 608 P.2d at 1097-98 ("The contention

8   that Tunnel Creek Road is a public road is confirmed in the record by evidentiary

9   material."). The court discussed the Colorado Supreme Court opinion later, in describing

10  the federal legal framework of R.S. 2477. *See id.* at 1098-99. There is no indication that

11  the *Anderson* court would have granted a right-of-way based on evidence of a single use

12  of public lands for travel. Moreover, Elko County's logic contradicts the rulings of several

13  other states, which, as noted above, rejected rights-of-way when presented with

14  evidence of only minimal, random, or sporadic travel across the land at issue.

15      Elko County's theory is further belied by Nevada's prescriptive easement rules,

16  which require a showing of "[a]dverse, continuous, open and peaceable use for five

17  years." *Stix v. La Rue*, 368 P.2d 167, 169 (Nev. 1962). If, as Elko County suggests, a

18  single person could accept an R.S. 2477 right-of-way by simply traversing government

19  land, then it would make little sense to require five years of continuous, adverse, and

20  open use to establish an analogous right over private land. Moreover, from a policy

21  standpoint, requiring more extensive public use to signal the acceptance of a right-of-

22  way seems necessary. Otherwise, Elko County could claim an R.S. 2477 right-of-way

23  over any public land in the Bruneau Addition that a single person traversed before the

24  land was reserved as a national forest in January 1909.

25      Ultimately recognizing that continuous public use of the South Canyon Road

26  requires a demonstration of more than random or merely occasional use, Elko County

27  has presented a detailed picture of the many activities occurring throughout the Jarbidge

28  Area at the close of the twentieth century. According to Elko County, even without direct

evidence of a road in the Jarbidge South Canyon, the indirect evidence establishes that the Jarbidge South Canyon was used as a travel route. But neither the direct nor the indirect evidence raises more tenuous inferences that a route existed in the Jarbidge South Canyon before 1909. Those inferences fall short of establishing continuous public use of the South Canyon Road by a preponderance of the evidence, let alone by clear and convincing evidence.

### 1.    Direct Evidence: The 1894 Map

The only evidence that directly suggests the existence of a route through the Jarbidge South Canyon is the 1894 Map. (EC Ex. 1191.) The 1894 Map shows a road running alongside a river that appears to bisect the northern border of Elko County; the parties dispute whether the road appears next to the Jarbidge River — and, in turn, runs through the South Canyon — or next to the Bruneau River. (*See supra* Section III.B.)

Testimony on the 1894 Map by both parties' witnesses exposed many inaccuracies. First, the 1894 Map attempted to depict portions of northern Elko County that had not yet been surveyed, including the Jarbidge South Canyon. The river at issue is not clearly labeled, but appears to depict a smudged "B," suggesting that the road runs alongside the Bruneau River, not the Jarbidge River. (*See supra* Section III.B.) Next, several landmarks on the Map appear to be in the wrong place, including Mardis — a known mining district — and Mary's River Peak. (*See supra* Section III.B.) The 1894 Map places Mardis just north of the point at which the road first appears alongside the river, when, in reality, Mardis was several miles southeast of the Jarbidge South Canyon. (*See supra* Section III.B.) And Mary's River Peak is about nine miles farther away from the Jarbidge River on the map than it ought to be. (*See supra* Section III.B.) Ultimately, the 1894 Map appears to depict a road running alongside the Bruneau River, not the Jarbidge River; the Map is therefore of limited import in showing that a route through the

///

///

///

35

1   Jarbidge South Canyon existed in 1894. The Map does not constitute clear and

2   convincing evidence of a road in the Jarbidge South Canyon.[21]

3                    **2.    Indirect Evidence**

4        Elko County chronicled many activities in the Jarbidge Area before the Bruneau

5   Addition's 1909 reservation, including surveying, prospecting, and sheep herding. (*See*

6   *supra* Section III.C.) The evidence shows that at least two parties — Frank Winter and

7   Dennis Scully — made their way into the Jarbidge South Canyon in the 1890s to

8   prospect and survey, respectively. (*See supra* Sections III.C.1.a, III.C.1.b.) But neither

9   Winter nor Scully left any indication that a trail or road existed in the South Canyon. More

10  important, Scully was tasked with noting any roads or trails he encountered during his

11  government survey, which ran through the South Canyon. (*See supra* Section III.C.1.b.)

12  Although Scully documented other roads and trails along his route, his 1896 survey

13  makes no mention of a road or trail in the Jarbidge South Canyon. Indeed, Scully's

14  survey might contain several inaccuracies, such as Scully's departure from the true 9th

15  Standard Parallel, possible drafting errors, or measuring errors as a result of difficult

16  terrain. (*See supra* Section III.C.1.b.) But these possible deficiencies do not change the

17  fact that the survey depicts no road or trail in the Jarbidge South Canyon.

18       Other evidence of use of the Jarbidge South Canyon by land claimants,

19  prospectors, and sheepherders similarly falls short. There is no dispute, for example,

20  that the Perkins Cabin was established just north of the Jarbidge South Canyon years

21  before the 1909 reservation. (*See supra* Section III.C.1.c.) There is likewise no evidence

22  that Perkins — or Mahoney, who subsequently purchased the Perkins Cabin —

23  necessarily traveled through the Jarbidge South Canyon to reach the Cabin. Instead,

24  they could have taken any number of routes to get there, including several established

25  trails to the east and west of the Jarbidge Mountains that appeared on maps as early as

26  1904. (*See supra* Section III.C.1.c.) The same holds true for prospectors like Bourne and

27  _____

28       [21]Nor does the 1894 Map establish the existence of a route by a preponderance
     of the evidence.

Escalon, who reached the area north of the Jarbidge South Canyon around 1909. (*See supra* Section III.C.2.a.) While it is possible that Bourne and Escalon traveled north through the Jarbidge South Canyon, it is equally plausible that they took other established routes to the area north of the South Canyon that eventually became modern-day Jarbidge. No evidence, however, suggests that Bourne and Escalon necessarily went through the Jarbidge South Canyon to reach Jarbidge. (*See supra* Section III.C.2.a.) Sheepherders likewise may have entered the Jarbidge South Canyon at some point before the January 1909 reservation, but the evidence does not show any repeated or widespread use of the Jarbidge South Canyon as a route for sheep. (*See supra* Section III.C.3.) Even if bands of sheep made their way into the Jarbidge South Canyon a handful of times before 1909, such sporadic use of the area does not rise to the level of continuous public use. *See S. Utah Wilderness All.*, 425 F.3d at 769-76.

In short, after adding up all of the evidence of activities in the Jarbidge Area, Elko County has suggested the possibility of only minimal and sporadic entries into the Jarbidge South Canyon before January 1909. Even assuming that the several known visitors to the Jarbidge Canyon before the 1909 mining boom — including Winter, Scully, Perkins, Mahoney, Bourne, Escalon, and possibly Baker — traveled alongside the Jarbidge River in the Jarbidge South Canyon, those few uses of the route still fall short of proving that continuous public use occurred along what is now the South Canyon Road before 1909. *See id.* at 772-76 (suggesting that continuous use of a route requires more extensive travel); *Anderson*, 608 P.2d at 1097-98 (finding that the facts supported a right-of-way under Nevada law after multiple maps unquestionably demonstrated that the road in question existed). The evidence is too scant to conclude, without speculating, that any of those visitors traveled on an established route through the Jarbidge South Canyon.

Finally, the opinions of Elko County's expert witnesses do not constitute clear and convincing evidence that a right-of-way existed in the Jarbidge South Canyon. McMullen, for instance, made clear that significant commerce and travel occurred in the Jarbidge

Area before 1909. (*See supra* Section III.C.6.) Even without any maps definitively showing a route through the Jarbidge South Canyon, McMullen concluded that such a route may have existed based on inferences about likely travel routes through the Jarbidge Mountains' rugged terrain. (*See supra* Section III.C.6.) Her opinion was corroborated by Price, who used modern mapping technologies to define the Jarbidge South Canyon as the fastest route to reach the town of Jarbidge from the south. (*See supra* Section III.C.6.) Both witnesses, however, rely on inferences derived from generalities about topography and likely travel routes. While this testimony suggests that travel along the Jarbidge South Canyon possibly occurred before January 1909, it does not establish that any route existed by clear and convincing evidence.

Taken together, the evidence falls short of the clear and convincing standard that Elko County must meet. Indeed, even under the less stringent preponderance of the evidence standard, Elko County has not shown that it is more likely than not that continuous public use of the Jarbidge South Canyon existed before the area was reserved as a national forest in January 1909. The mere possibility that a handful of people traveled through the Jarbidge South Canyon is not sufficient to establish an R.S. 2477 right-of-way.

### C. Absent a Showing of Clear and Convincing Evidence, the Court Cannot Approve the Proposed Consent Decree

The Court can approve a consent decree only if it is "fair, reasonable and equitable and does not violate the law or public policy." *Turtle Island Restoration Network v. U.S. Dep't of Commerce*, 672 F.3d 1160, 1165 (9th Cir. 2012) (quoting *Sierra Club, Inc. v. Elec. Controls Design, Inc.*, 909 F.2d 1350, 1355 (9th Cir. 1990)). The proposed consent decree provides that "[t]he United States will not now or in the future contest that Elko County has an R.S. 2477 right of way for a road running generally from Pavlak Grade to the Snowslide Gulch Trail head [the South Canyon Road]." (ECF No. 118 at 7.) Unless Elko County can establish that it already owns a right-of-way through the Jarbidge South Canyon, the proposed consent decree would relinquish the United

States' property to the County. As the Court has already ruled, if the consent decree has the effect of disposing of federal land, it would not comply with applicable laws and policies. (ECF No. 507 at 5.)

Elko County has failed to show by clear and convincing evidence — indeed, even by a preponderance of the evidence — that it has a right-of-way through the Jarbidge South Canyon. Because the consent decree would give Elko County the disputed right-of-way in contravention of applicable law and policy, the Court must reject the proposed consent decree.

**V.    CONCLUSION**

The Court finds that no continuous public use of the Jarbidge South Canyon occurred prior to the reservation of Bruneau Addition in January 1909. Elko County has accordingly failed to establish that it has an R.S. 2477 right-of-way for the South Canyon Road. The proposed consent decree, however, explicitly recognizes Elko County's right-of-way. (ECF No. 118 at 7.) Without evidence that Elko County owns the right-of-way, the consent decree gives land of the United States to Elko County without following proper procedural requirements. The Court therefore cannot approve the proposed consent decree.

DATED THIS 16th day of August 2016.

_____
MIRANDA M. DU
UNITED STATES DISTRICT JUDGE